Page 1

UNITED STATED DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JOANN HOWARD                          CIVIL ACTION NO: 17-7142

VERSUS                                    SECTION:   "F"  (3)

ST. JOHN THE BAPTIST PARISH

PUBLIC SCHOOL DISTRICT KENDRIA

SPEARS IN HER CAPACITY AS PRINCIPAL

FOR ST. JOHN THE BAPTIST PUBLIC

SCHOOL DISTRICT, PAGE ESCHETTE,

IN HER CAPACITY AS DIRECTOR OF

HUMAN RESOURCES FOR ST. JOHN

THE BAPTIST PARISH PUBLIC

SCHOOL DISTRICT, KEVIN GEORGE,

HIS CAPACITY AS SUPERINTENDENT

FOR ST. JOHN THE BAPTIST PARISH

PUBLIC SCHOOL DISTRICT

* * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF

PAGE ESCHETTE

Taken in connection with the captioned cause, pursuant to the following stipulations before Yvonne G. Hoffpauir, Certified Court Reporter, at the Lafayette Parish Association, 2607 Johnston Street, Lafayette, Louisiana, on the 23rd day of October 2018, beginning at 11:00 a.m.

Page Eschette
October 23, 2018

**Page 2**

APPEARANCES:

FOR THE PLAINTIFF, JOANN HOWARD:

    CLARENCE ROBY, JR., ESQUIRE

    LAW OFFICE OF CLARENCE ROBY, JR.

    3701 CANAL STREET, SUITE U

    NEW ORLEANS, LOUISIANA 70119

    croby@crobylawfirm.com

FOR THE DEFENDANTS, ST. JOHN THE BAPTIST PARISH PUBLIC SCHOOL DISTRICT:

    KEVIN P. KLIBERT, ESQUIRE

    BECNEL LAW FIRM

    425 WEST AIRLINE HIGHWAY, SUITE B

    LAPLACE, LOUISIANA 70068

    kklibert@becnellaw.com

ALSO PRESENT:

    JOANN HOWARD

REPORTED BY:

    YVONNE G. HOFFPAUIR, CCR

**Page 3**

STIPULATIONS

It is hereby stipulated by and between counsel of record for the parties hereto the deposition of PAGE ESCHETTE is being taken pursuant to notice and in accordance with the Federal Rules of Civil Procedure and for all uses and purposes thereby provided.

That at formalities with the taking of the deposition are hereby waived, with the exception of the swearing of the witness and reduction of the questions and the answers to typewriting, and the right of the witness to read and sign the completed transcript of testimony was waived;

That all objections, save those as to the form of the question, and responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence, such objections as might have been made had the testimony been given in Open Court;

That Yvonne G. Hoffpauir, Certified Court Reporter, officiated in administering the oath to the above-named witness.

**Page 4**

INDEX

EXAMINATION BY MR. ROBY ................................. 5

EXHIBITS:

NO. 1    LETTER DATED 8/12/14 ................. 20

NO. 2    DR. CUSCO TREATMENT PLAN ....... 23

NO. 3    LETTER DATED 12/1/14 ................. 31

NO. 4    LETTER DATED 7/28/14 ................. 34

NO. 5    MEDICAL REQUEST LEAVE FORM ...... 34

NO. 6    PAYROLL STATUS FORM ............... 42

NO. 7    APPROVAL OF SABBATICAL DATED 8/12/14 ... 43

NO. 8a, 8b    EMPLOYEE INTENT FORM DATED MAY OF 2015 ... 47

NO. 9    LETTER TO DEPARTMENT OF EDUCATION ... 64

NO. 10    EMAIL BY PATRICIA TRICHE DATED 8/6/15 ... 72

NO. 11    LETTER DATED 5/1/14 ................. 84

NO. 12    LETTER DATED 8/17/15 ................. 85

NO. 13    LETTER DATED 4/24/15 ................. 95

NO. 14    LETTER DATED 8/21/15 TO MR. GEORGE ... 100

NO. 15    ONLINE PAYROLL STATUS FORM ...... 105

**Page 5**

PAGE ESCHETTE, THE WITNESS HEREINBEFORE NAMED, AFTER BEING FIRST DULY CAUTIONED AND SWORN TO TELL THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, TESTIFIED ON OATH AS FOLLOWS:

EXAMINATION BY MR. ROBY:

Q    Good morning.  Is it Eschette?

A    Yes.

Q    Ms. Eschette, my name is Clarence Roby, and I represent Ms. Joann Howard.

A    Okay.

Q    It's a pleasure meeting you.  I appreciate you accommodating us.  I know this is kind of probably a new thing for you, but it's something that Kevin and I do all the time.  So I never take it for granted to be in your seat.

Have you ever been deposed before?

A    Yes.  Once.

Q    Okay.  I'll try not to talk over you.

A    Okay.

Q    I will do the best I can to ask questions that make sense in full sentences.  And I don't want you to guess about anything.  So if I'm not clear with my question, just

Douget Court & Video Reporters / Trial Technology Specialists
800-259-9900    After hours: 337-304-8207    Notices: robin@court-video.com

Page Eschette
October 23, 2018

Page 6

ask me to repeat it.

A    Okay.

Q    And hopefully we won't be here too long. I have a finite body of questions I want to ask you. This is regarding your previous position as the HR director at St. John the Baptist. I understand you're now retired?

A    Yes, I am.

Q    Congratulations.

A    Well, thank you.

Q    And we were talking briefly off the record. I don't do like a lot of lawyers and ask a whole bunch of unnecessary background questions.

A    All right.

Q    That's not my purpose. I'm not here to ask you everything that happened from childbirth to today.

A    I'm glad because I was trying to remember when I began as HR director.

Q    Lawyers who do that, I think, is just wasting time.

    MR. ROBY:

        Waive reading and signing?

Page 7

    MR. KLIBERT:

        Yes.

    MR. ROBY:

        Okay.

BY MR. ROBY:

Q    And you have the right to read the deposition. We're on a tight schedule because of some directives from the court.

A    Okay.

Q    So you have a right typically to read the transcript, review it. You can't change the substance of your testimony, but in some cases, if there are questionable spellings or pronunciations, and sometimes the witnesses want to make sure that the record is clear and concise. But we both have responses that are due in a pretty short order so --

A    Okay.

Q    -- I appreciate your lawyer waiving it. That way we can at least respond according to the court. Any questions so far?

A    No.

Q    Would you state your full name and address

Page 8

for the record?

A    Page Mary Eschette. I am currently residing at 1960 Guillot Road, Youngsville, Louisiana.

Q    And has that been your residence since your retirement?

A    No. I'm just like in the process of moving, one house for sale, and just purchased this house, but I have been in this house for almost a year, you know.

Q    Prior to that time, did you reside in St. John the Baptist Parish?

A    I had two residences at that time. Okay. So I lived at 1410 Lutcher Avenue in Lutcher.

Q    Okay.

A    And the other address still, 135 Woodstock, Youngsville, Louisiana.

Q    Do you know Ms. Joann Howard?

A    Yes, I do.

Q    And how do you know her?

A    She was a teacher in the district when I -- part of the time while I was an HR director.

Page 9

Q    When did you -- what was the time frame of the tenor for serving as HR director?

A    I started in July of 2013.

Q    And prior to July of '13, in what capacity did you work?

A    I was a coordinator of federal and state funding.

Q    Was that also for the parish school district?

A    Yes. Yes.

Q    Could you briefly describe your duties and responsibilities as the HR director?

A    I am responsible for recruiting teachers, making sure that we have all the teachers we need at all times. Specially certified teachers was more of my emphasis. I was also responsible for any type of disciplinary issues related to employees. All right. I not only was worried about hiring certified teachers, but I was worried about hiring any and all employees. All right. I did advertisements, job descriptions. Policies fell under my venue. Working as a liaison with the district's union, SJAE.

3 (Pages 6 to 9)

Page Eschette
October 23, 2018

Page 10

Gosh. That encompasses a lot of things.

Q   A lot.

A   A lot. All right.

Q   Ms. Howard was employed as a teacher prior to you assuming the HR position, correct?

A   Yes. You know what? I'm saying yes. I seem to remember yes, you know, she was already in that position.

Q   And I guess a better way to ask that question is, you didn't recruit her?

A   No, I did not.

Q   Okay. The policies that you speak of, what would that include?

A   Actually, I was like the gatekeeper for policies. It was all policies for the district. As I say gatekeeper, I would just make sure when there was a change of policy, the appropriate department was involved. There could have been a personnel policy. It could have been, you know, an academic policy. It could have been a maintenance policy. Of course, the policies related to personnel I took care of, you know, more so than the other policies because I was just like pretty

Page 11

much the gatekeeper, you know, made sure the right departments were onboard when there was policy changes, or policies that they wanted to change. All right.

Q   They being the district?

A   Any employees, the district, the board. There was a huge policy manual, you know, that we just made sure we kept updated, and we went through the procedures for policy changes.

Q   To the best of your --

A   Or new --

Q   I'm sorry. Go ahead.

A   Or new -- when new policies were being introduced.

Q   Okay. And to the best of your recollection, did you have an occasion to be engaged or involved in any policy changes concerning the school district's policy regarding leave, particularly medical leave?

A   There have been -- during my tenor as HR, honestly I can't tell you that. You know, there might not have -- there may have been a word change. I can't tell you for

Page 12

sure. I'm being honest with you. You know, policies changed regularly.

Q   I want to focus particularly on the academic school year of 2013-2014.

A   Okay.

Q   Did you have an occasion to receive any notice from Ms. Howard regarding her employment status with the district?

A   No.

Q   Okay.

A   No. Like change of employment, like termination?

Q   Well --

A   Or leaving or anything? I'm not --

Q   Medical leave particularly.

A   Oh, yes, we did, you know, a request for medical leave. Yes.

Q   And you are aware that you are a named party in your official capacity as a defendant in this litigation, correct?

A   Yes.

Q   And have you had an occasion to be informed as to what some of the allegations are in this suit by Ms. Howard?

Page 13

A   Discrimination because I did not approve the initial request for leave. I requested a second opinion.

Q   In the summer of 2014, I believe, were you aware of Ms. Howard requesting leave due to medical reasons from the district?

A   Yes.

Q   Tell me what you remember.

A   A request, standard forms, that she filled out. It was turned into my office, if I'm not mistaken, in July, prior to the school year requesting medical leave due to stress, and it was signed by a doctor of her choice.

Q   Do you remember Ms. Howard requesting a particular form, particularly a sabbatical medical leave?

A   Yes. She requested a medical sabbatical.

Q   And is there a distinction between a sabbatical medical leave as opposed, I guess, to an ordinary medical leave?

A   There are two types of leaves she could have gotten, two types of sabbatical leaves. Okay. A request for -- I can't even think of the terminology now, but for

4 (Pages 10 to 13)

Page Eschette
October 23, 2018

Page 14

ongoing education. All right. You can ask for that type of sabbatical. All right. Those are medical and just your ordinary, you know, ongoing educational purposes sabbatical.

Now, those are two types of leaves, and there's other leaves, as well. I mean, you could have FMLA, you could have leave, request for leave, without pay, a request for leave with pay. You could request a leave, just a regular sick leave, which means you are utilizing your own accumulated sick days.

Q    And to the best of your recollection, what type of leave do you -- if you remember Ms. Howard requesting?

A    Medical.

Q    And again, that was based on documentation that she provided to you concerning stress related to her job?

A    Yes, sir.

Q    And do you remember reviewing the documentation --

A    Of course.

Q    -- wherein that --

Page 15

A    Of course.

Q    -- was requested?

COURT REPORTER:
Just wait until he finishes his question. That helps me.

A    I'm sorry.

BY MR. ROBY:

Q    That's okay.

A    I'm sorry.

Q    The hard part when you're being deposed is anticipating the question. I have a general idea of what I'm going to ask you --

A    Okay.

Q    -- and I promise you this would go much smoother if I can just ask you those brief questions, and then you can explain if you need to. I promise I won't cut you off if you need to do that.

When Ms. Howard requested, originally requested, her sabbatical, medical sabbatical leave, was it approved by you?

A    Not initially, no.

Q    And why not?

Page 16

A    I asked for -- based on board policy --

COURT REPORTER:
Based on what policy?

WITNESS:
Board policy.

A    I asked for a second opinion, and I provided a doctor's name. Of course, based on the board's policy, it was a physician of the board's choice, and this was a physician that the board was using at that time.

BY MR. ROBY:

Q    And was it Dr. -- is it Crusco?

A    Cusco.

Q    Cusco?

A    Cusco. That's what I call him. I might have said it wrong.

COURT REPORTER:
How do you spell it?

WITNESS:
Oh, gosh.

MR. KLIBERT:
C-U-S-C-O.

COURT REPORTER:
Okay.

Page 17

MR. KLIBERT:
Cusco.

BY MR. ROBY:

Q    So you made the referral to Dr. Cusco for the second opinion?

A    I did. I asked -- if I'm not mistaken, I asked for her to contact that person, and I did follow up with a phone call to let the doctor know that there would be somebody contacting for a second opinion.

Q    And was Dr. Cusco someone that the board had identified as a qualified vendor? For instance, was this a doctor that the district would typically refer employees to for such an opinion?

A    At that time, he was the doctor we referred all on doctor's second opinions for that -- for stress at that point. That's who we were using. That's the only -- let me say this. That's the only doctor I was familiar with at that time that the board used.

Q    Do you know what his qualifications were as a physician?

A    No, I do not.

Douget Court & Video Reporters / Trial Technology Specialists
800-259-9900    After hours: 337-304-8207    Notices: robin@court-video.com

Page Eschette
October 23, 2018

Page 18

Q   You don't know if he was a specialist or just a general practitioner?

A   No, I do not.

Q   Is that something you considered or would have considered before asking her to go see someone that the district had designated for an opinion?

A   I would have considered it if someone had asked me, you know, for a different doctor, if that's what you're asking me.

Q   Well, I guess the question is, here's an employee who has sought leave because of something other than an apparent physical impairment, and by that, I mean no broken bones, no dislocation of some appendage, no complaints of herniation or pain in their back, but she has sought leave because she has alleged stress and depression associated with her job. And as I appreciate it, Dr. Cusco is not a trained psychiatrist or psychologist, correct?

A   No. At this point, I can't say for sure that he is. All right. But I do know when I made that decision to her to the --

Page 19

or to use Dr. Cusco, I took into consideration that the information I was receiving was from a general practitioner in her paperwork, too.

Q   And that would have been, I think, Dr. Arcuri?

A   Arcuri.

Q   Who was her GP?

A   Right.

Q   And so -- all right. Did you discuss with Dr. Cusco what he was supposed to do in evaluating Ms. Howard regarding the second opinion?

A   No, I did not.

Q   Did he ultimately examine her and render a second opinion?

A   Yes, he did.

Q   And to the best of your recollection, did he support Dr. Arcuri's suggestion that she was in need or should be qualified for a sabbatical leave?

A   Yes.

Q   And that was granted by you?

A   Yes, it was.

Q   Did you and you alone make that

Page 20

determination, or did the superintendent or the principal assist you in making the determination?

A   Not the principal. All my decisions are based with after conferencing with the superintendent. All right. So, of course, just in regular conferencing, you know when we met each day, we would discuss situations like this.

Q   I'm going to show you what I'm going to mark for identification purposes as Howard 1. It's a letter dated August 12th of 2014.

A   Uh-huh.

Q   See if you recognize that document.

A   (Witness reviews document.) Yes, I recognize it.

Q   Okay. Now, according to that document, the first sentence suggests that you -- specifically I'll read it. "Your request for medical sabbatical leave was approved by me on behalf of Superintendent, Kevin George --

A   Uh-huh.

Q   -- "effective for the fall of 2014."

Page 21

Okay. And so is it your testimony you would have discussed the medical sabbatical leave prior to this August 12th date with the superintendent?

A   I would have told him that I was granting sabbatical leave. All right. To say that I would have gone into detail about the actual documentation, you know, let's say that I would have told him that the second opinion supports, you know, I can't tell you verbatim what I told him.

Q   But your testimony is you would have told him that you granted the leave, not that he was authorizing you to grant the leave, but it would have been your decision as HR director to leave or not?

A   Right.

Q   Okay. Fair. And the second paragraph, is that a fair and accurate representation of what you believe the policy to be regarding the granting of sabbatical leave?

A   Yes. "If you do not return, you shall forfeit."

Q   Particularly the language concerning

6 (Pages 18 to 21)

Page Eschette
October 23, 2018

Page 22

"...incapacitated illness and certified by two physicians." And so that goes on to address, if you don't have that, then you shall forfeit compensation received during the leave period.

A   Okay. (Witness reviews document.) Yes. That's how it -- yeah.

Q   And the remaining portion of that suggests that the person who is on sabbatical leave is required to notify the superintendent thirty days prior to the beginning of the semester in which he or she expects to return?

A   Yes.

Q   And that's directly from the board policy that was in place --

A   Yes.

Q   -- at that time?

A   Yes.

Q   Okay. The last paragraph reads, "Before you return to work on January 5th of 2014, you must follow the treatment plan of Dr. Cusco as evidenced on the attached Disposition form received August 12th of '14."

Page 23

A   Uh-huh. Right.

Q   And did you provide Ms. Howard with a copy of the disposition form outlining Dr. Cusco's --

A   Yes.

Q   -- treatment plan?

A   Yes.

Q   Okay.

A   Do you have it?

Q   I'm going to -- for the purposes of the deposition, we'll mark that as --

MR. KLIBERT:
     Well, wait. I don't want to show her anything that's --

MR. ROBY:
     No. It's okay. Let me see it, Kevin.

MR. KLIBERT:
     Sure.

MR. ROBY:
     As Howard 2.

A   Yes.

BY MR. ROBY:

Q   Give me one second. Did you review the doctor's plan, treatment plan?

Page 24

A   Yes.

Q   And what is your appreciation of the plan that he had in place for Ms. Howard?

A   Of course that she --

WITNESS:
     Can I bring this a little bit closer?

MR. KLIBERT:
     Yes, absolutely.

A   Two different pairs of glasses, and the one that I need -- I got the one that's -- okay. Of course, it said that, you know, she was distraught, and she needed the time off. That's what I deduced from it, and the point where it was no working with children unless she was cleared prior to returning really catches my attention, as well.

BY MR. ROBY:

Q   Okay. So, "Patient, at this time, appears unable to function as a teacher due to emotional liability. Recommend formal psychiatric evaluations prior to resumption of teaching duties. No working with children until cleared by

Page 25

psychiatrist." I think that's --

A   Uh-huh.

Q   -- my recitation of what he said.

A   That's it. Yes.

Q   He writes about as bad as I do.

A   Yes.

Q   If not worse, but I've looked at these enough to kind of figure it out over time.

A   That's what I read. Yes.

Q   And that document, Howard 2, is dated 8/12/14 --

A   Yes.

Q   -- at the top right-hand corner?

A   Yes.

Q   And this was his initial evaluation?

A   Yes, it was.

Q   The box underneath says "recheck examination," that's not checked, correct?

A   Gosh --

MR. KLIBERT:
     Upper left or right?

A   No. It's initial examination. I was looking at the bottom. I'm sorry. Yes.

BY MR. ROBY:

Q   And if you go down the line that's drawn

Douget Court & Video Reporters / Trial Technology Specialists
800-259-9900    After hours: 337-304-8207    Notices: robin@court-video.com

Page Eschette
October 23, 2018

Page 26

close to the bottom of that, "light duty" is checked off. I'm not sure what that means, but that appears to be checked off in the left-hand corner?

A    Right.

Q    The dates appears to be 8/12/14 to "cleared by psychiatrist"?

A    Correct.

Q    And I believe that next scribble scraps is, "no working with children until cleared"?

A    Correct.

Q    And there's no other date other than the date that appears at the bottom right-hand corner, correct?

A    That's correct.

Q    And I'm assuming that's the doctor's signature on that document?

A    Correct.

Q    To the best of your recollection, how -- what other time did Dr. Cusco see Ms. Howard, other than this initial examination?

A    I don't know that.

Q    And up until the time of separation, were

Page 27

you ever made aware that Dr. Cusco had seen or evaluated Ms. Howard other than at this time?

A    No, I was not made aware of any other time.

Q    Did Ms. Howard return to work for the spring semester of 2015?

A    No, she did not.

Q    Do you -- did you request any other documentation from her not with --

A    Wait, can I back up?

Q    Yes, ma'am. Sure.

A    It would have been the '15, 2015, right?

Q    Yes, ma'am.

A    So I'm getting my years -- so she did not return in 2015. Did you say '16?

Q    I may have, but I meant '15.

COURT REPORTER:
He said '15.

A    Okay. I'm sorry. So it was 2015. Okay.

BY MR. ROBY:

Q    So your letter that you pinned to her dated August 12 of '14 suggested that before she returns to work on January 5th of '14, she was to follow a treatment plan

Page 28

by Dr. Cusco as evidenced by the attached disposition received from him on the 12th.

A    Right.

Q    And we've identified that document as Howard 2, correct?

A    Right.

Q    Before January 5th of '14, did you have an occasion to verify from Ms. Howard her medical status to assess her fitness to return to work on January 5th of '14?

A    No, I did not.

Q    And why not?

A    I had no contact.

Q    As HR director, you sent her this letter that we've identified on August 12th referencing returning to work on the 5th of January of '14.

A    Uh-huh.

Q    I'm assuming you actually meant '15, not '14?

A    Yeah.

Q    Okay. And you had no contact with her because you -- did you just waive that date, or was it of no consequence for some other purpose?

Page 29

A    At that time, I had to waive the date because I had no teacher to put in the classroom. Okay. There had been no contact. Okay. Except for the fact that we had a request for an additional sabbatical without medical. So at that point, the decision was made to extend the sabbatical.

Q    Who made that decision?

A    I'm sure myself, and I just let Mr. George know about it.

Q    So the --

A    I made -- can I say this?

Q    Please.

A    I made the decision based on the fact that I did not have a psychiatric eval or any other medical documentation to support that she was ready to return to the classroom or not ready to return to the classroom.

Q    Was that in addition to you not having a teacher to fill the position?

A    You take all of those. You take all of that into consideration when you're, you know, placing teachers in classrooms or

Douget Court & Video Reporters / Trial Technology Specialists
800-259-9900    After hours: 337-304-8207    Notices: robin@court-video.com

Page Eschette
October 23, 2018

Page 30

removing teachers, you know. I'm down -- you know, I need a teacher. Okay.

Q   The reason why I asked the question is when you first started answering the question, you suggested that you had not reached out to her because you did not have a teacher to fill that position. And then you went back and clarified that you extended it for the reasons that you --

A   Uh-huh.

Q   -- just asserted.

A   When making decisions, a lot of factors play into it. All right. When I sent -- isn't there another letter that I sent to her?

Q   Yes, ma'am. We're going to get to it.

A   Okay.

Q   There are a couple of letters.

A   Right. Between this August 12th, an intent to return?

Q   Yes, ma'am.

A   All right. And a request for additional sabbatical. All of those factors play into it. And honestly, I can't tell you

Page 31

what the situation was, whether I had a teacher at the time. I don't have access to that, those records.

Q   Okay. So I'm going to show you what I'll mark as Howard 3.

A   Okay. (Witness reviews document.)

Q   That letter's dated December 1st of 2015?

A   Uh-huh.

Q   Okay. And is that the letter that you're referencing regarding the request to extend the medical leave?

A   Right.

Q   Okay.

A   There would have been a request for the sabbatical leave. Do you have that?

Q   So it says in that first -- second sentence in that first paragraph, "Your sabbatical is effective for the spring of 2015."

A   Uh-huh.

Q   And that letter's dated December 1 of '14?

A   Uh-huh.

MR. KLIBERT:
      You have to answer yes.

Page 32

A   Yes.

BY MR. ROBY:

Q   Okay. So therefore, it wouldn't be necessary for her to have provided you with any additional information as it relates to that January 5th of 2015 date, correct, based on you extending her leave for the spring?

A   No. I would have needed clearance from the doctor.

Q   Okay. Do you have any information or documentation to suggest that Dr. Cusco --

A   Cusco.

Q   -- Cusco gave you some follow-up regarding her status for the spring of '15?

A   No, I do not.

MR. ROBY:
      Can we go off the record for a second?

MR. KLIBERT:
      Sure.

      (OFF THE RECORD)

BY MR. ROBY:

Q   So, Ms. Eschette, I guess the question that I would have is, you referred or

Page 33

required Ms. Howard to see a physician identified as an agent on behalf of the district, Dr. Cusco, correct?

A   Yes.

Q   Ms. Howard did in fact see the doctor at least on that one occasion?

A   (No verbal response.)

Q   Yes?

A   Yes.

Q   And the doctor rendered an opinion in support of Ms. Howard's physician, Dr. Arcuri, that she was unable or unfit to return to work, based on his evaluations?

A   Yes.

Q   Okay. Do you remember Ms. Howard also being requested to bring her doctor's notes or records with her when she saw Dr. Cusco for his review?

A   Do I remember telling her, or what are you asking? Can you repeat the question?

Q   Thank you for having me clean up my convoluted question. When you suggested that Ms. Howard see Dr. Cusco for a second opinion, do you remember asking her to

9 (Pages 30 to 33)

Page Eschette
October 23, 2018

Page 34

bring her medical records with her to that visit?

A   I don't remember.

Q   I'm going to show you what I'll mark for the purpose of identification as --

MR. KLIBERT:
      4.

BY MR. ROBY:

Q   -- Howard 4.

MR. ROBY:
      Thank you.

MR. KLIBERT:
      Uh-huh.

BY MR. ROBY:

Q   And I typically try not to be out of order chronologically, but I apologize for that. Do you recognize that document?

A   (Witness reviews document.)

Q   Yes. And it's dated July 28, '14?

A   Yes.

Q   To Ms. Howard from you?

A   Okay.

Q   And this document suggests that you were in receipt of her request for an extended sick leave for the period of August 4th

Page 35

through December of '14?

A   Yes.

Q   Okay. In this letter is when you informed her that you would be requiring a second opinion with a doctor of your choice?

A   Correct.

Q   And you identified Dr. Cusco?

A   Correct.

Q   Provided his address and other contact information?

A   Correct.

Q   And I'm assuming you had attached some documents because it does say attachments. That would have been the document, I think, we've identified as Howard 2?

MR. KLIBERT:
      2 is just the Cusco record.

MR. ROBY:
      There's another document. It's a form.

MR. KLIBERT:
      You're talking about the medical leave request form?

MR. ROBY:
      Yeah. We'll pass on that.

Page 36

MR. KLIBERT:
      Hold on. This is what you're talking about?

MR. ROBY:
      Yeah, that's it. It's like a questionnaire.

MR. KLIBERT:
      Yeah. It's two pages?

MR. ROBY:
      Yes.

MR. KLIBERT:
      And it was Exhibit 2 to my Motion for Summary Judgment, just so we can relate it back. Do you want me to show her this --

MR. ROBY:
      Yes, please.

MR. KLIBERT:
      -- and we'll supplement this one, too?

MR. ROBY:
      Yes.

MR. KLIBERT:
      And that's Howard 5.

A   Yes. Okay. I recognize this document.

Page 37

BY MR. ROBY:

Q   Now, Howard 5 is a document that the district prepared, correct? This is Howard 5?

A   What I'm looking at is Howard 5?

Q   Yes. I think it's the same document.

MR. KLIBERT:
      It's the same thing.

A   Yes. Yes.

BY MR. ROBY:

Q   So this is actually a document that the district prepared?

A   Yes.

Q   And you would have provided that to Ms. Howard for her to present to Dr. Cusco?

A   No. This one that I have right here --

MR. KLIBERT:
      Why don't we make sure? Why don't we look at this one then to make sure that there's nothing --

A   This is --

BY MR. ROBY:

Q   It's filled out by Dr. Arcuri?

A   Right. I would have sent this -- right,

Douget Court & Video Reporters / Trial Technology Specialists
800-259-9900   After hours: 337-304-8207   Notices: robin@court-video.com

Page Eschette
October 23, 2018

Page 38

the initial request. Right.

Q   So her doctor had to complete that, and then she had to bring that with her when she saw Dr. Cusco?

A   Right.

Q   That's Howard 5.

A   Okay. Yes.

Q   Okay. And as we sit here today, obviously we know that Ms. Howard did in fact comply with your request --

A   Yes.

Q   -- and submitted those -- that outline and those documents to Dr. Cusco, correct?

A   I don't know for sure that she submitted these actual documents. I do know that she saw Dr. Cusco.

Q   Fair.

MR. ROBY:

Can we go off the record one second?

MR. KLIBERT:

Sure.

(OFF THE RECORD)

BY MR. ROBY:

Q   Pursuant to your authorization in December

Page 39

granting Ms. Howard the spring semester leave, do you remember receiving any additional documentation from her verifying her medical status?

A   There was a request for a medical sabbatical.

Q   For medical sabbatical, right?

A   Correct.

Q   Did you ask her to give you any updated medical from Dr. Arcuri? Clearly, she only saw Dr. Cusco that one time. Do you remember if she provided any additional documentation from Dr. Arcuri?

A   Not -- no, not that I know of.

Q   And particularly, you don't remember receiving a note from her doctor in November of '14 indicating that she continues to be unable to return to work due to anxiety?

A   From Dr. Cusco or Dr. Arcuri?

Q   Dr. Arcuri.

A   No. I received a medical sabbatical leave from Dr. Arcuri. I'm sorry. I'm getting confused. So now we're on December's?

Q   Yes, ma'am.

Page 40

A   Okay. Yes. The new medical sabbatical was from Dr. Arcuri. She did not go back to Dr. Cusco in December.

Q   And when you got that note from Dr. Arcuri, you didn't ask her or suggest that she go back to Dr. Cusco again for a second opinion from him to support Dr. Arcuri's determination --

A   No.

Q   -- of her fitness?

A   No, I did not.

Q   And why not?

A   I felt like it was an ongoing situation.

Q   And I'm not a doctor, and I will assume that you're not either.

A   No.

Q   But that was just a determination that you made in your professional judgment?

A   Yes. And it has -- it happens pretty regularly, a request for an extension of the leave, I would say. Okay.

Q   So you didn't find anything extraordinary about that?

A   No, I didn't.

Q   Okay. And you did in fact authorize a

Page 41

sabbatical. I'm going to show you what we've marked as --

MR. ROBY:

We're on 5?

A   So I approved the sabbatical. I don't see the documentation I had for it. Is that another --

COURT REPORTER:

The next number is 6.

MR. ROBY:

Okay.

BY MR. ROBY:

Q   So this is how we're going to do this. This lady is extremely proficient in what she's doing.

COURT REPORTER:

I try to be.

BY MR. ROBY:

Q   But the challenge that she will have invariably, if you and I can't reach a better understanding, even when you mumble --

A   Okay.

Q   -- that's an official response --

A   All right.

11 (Pages 38 to 41)

Douget Court & Video Reporters / Trial Technology Specialists
800-259-9900    After hours: 337-304-8207    Notices: robin@court-video.com

Page Eschette
October 23, 2018

Page 42

Q -- to some degree. And she's challenged to take down, or at least attempt to take down, how you respond.

A Okay.

Q So it's important that you only respond either yes or no, and then with --

A All right. I'm sorry.

Q And then with an explanation. Okay?

A Okay.

Q And now it has to be verbal.

A Okay.

Q All right. So I'm going to show you what I'll mark as Howard 6, and tell me if you recognize that document.

A (Witness reviews document.) Yes, I do.

Q And what is that?

A A payroll status form is a form used to document a change in payroll. I complete this form, and it goes to the payroll department.

Q And what is the further significance of that document? What does it say at the bottom portion, the typed comment?

A Oh, I'm sorry. "Sabbatical, spring of 2015."

Page 43

Q Okay. And that's for Ms. Howard?

A Is it referencing Ms. Howard?

Q Yes, ma'am.

A Yes.

Q And it's approved by you?

A Yes.

Q Okay. And for the record, the document doesn't reference any other comments other than "sabbatical, spring of 2015," correct?

A Correct.

Q Okay. I'll show you what I'll mark as Howard 7.

A (Witness reviews document.)

Q And this document is actually dated 8/12/14. We've already determined that on 8/12/14, Ms. Howard had been approved by you based on the second opinion rendered by Dr. Cusco --

A Uh-huh.

Q -- on that same date, correct?

A Correct.

Q And that approval was for a sabbatical for fall of 2014?

A Yes.

Page 44

Q And it shows authorized by, and I can't read that person's handwriting.

A That's me.

Q No. Authorized by --

A Authorized by D. Duhe, approved by Page Eschette.

Q And Ms. Duhe was someone who worked under your supervision?

A Yes. She was my assistant, secretary.

Q So your assistant authorized it, and then you approved it?

A Correct.

Q And then I'm not sure whose initials are referenced at the bottom.

A This is possibly payroll to show that -- or technology --

Q That it was processed?

A -- that it was processed.

Q Okay. Did Ms. Howard in fact take her sabbatical for the spring of 2015?

A Yes.

Q And to the best of your recollection, that was without incident?

A Yes.

Q And --

Page 45

A Yes. I'm sorry.

Q That's good.

COURT REPORTER:
It's getting lower, lower and lower.

A I'm thinking. I'm trying to think it through.

BY MR. ROBY:

Q I promise you I'm not going to ask you anything so complicated that it's going to require you to over think it.

A You know in school years, it's not like a regular year.

Q Oh, I get it. My youngest is on trimesters. I've not figured that out just yet, other than my wife telling me the check is due.

A At Tech?

Q He's at SCAD, Savannah College of Arts and Design.

A Wonderful.

Q He'll be finished this semester.

A That's even better.

Q Praise the Lord. After the spring of 2015, did you have an occasion to

12 (Pages 42 to 45)

Page Eschette
October 23, 2018

Page 46

engage Ms. Howard about her medical status?

A   No.

Q   To the best of your recollection, did she attempt to contact you or anyone else in the district regarding her medical status?

A   No.

Q   And to the best of your recollection, did she inquire as to her ability to return to work?

A   No.

Q   You had approved her sabbatical through the spring of '15. Did you inquire as to whether or not she was going to return to work in the fall of 2015 for the academic year of 2015-2016?

A   Yes.

Q   And when did you do that?

A   A letter was sent out in May; January and May.

Q   And how was the letter sent?

A   U.S. Postal.

Q   Regular mail or certified?

A   The second one was certified.

Page 47

Q   And the second one being in May?

A   Uh-huh.

Q   Yes?

    MR. KLIBERT:
        Yes?

A   Yes. I'm sorry.

BY MR. ROBY:

Q   Was there a particular reason as to why the letter was sent out certified in May, as opposed to the January letter being sent out regular mail?

A   The January one is sent to all employees. All right. And at that time, anybody who is on leave or on sabbatical, we just put out a bulk mail to all of those people. It's when you're staffing in April and May for the upcoming school year, and you haven't received any -- if I hadn't received any information from an employee, that's when I needed the documentation. That's why it was certified in May. So the letter, it's called a Letter of Intent, in January.

Q   Okay. I'm going to show you what I'll mark as Howard 8 en globo. It's a two-

Page 48

page -- one says two pages. I'm not going to say document, but the two pages. Tell me if you -- and ignore the printing at the top. We've already filed and recorded some of those documents. So those are just copies that I have with me.

A   (Witness reviews document.) Okay.

Q   Does that document represent what you have testified to as what you sent out in May of 2015?

A   Yes.

Q   And at the top of the document, page 1 of 2, it says "Employee Intent Form?"

A   Yes.

Q   2015-2016 school term?

A   Yes.

Q   "Must be returned to school office by January 23rd of 2015"?

A   Correct.

Q   Now, the second page of that compilation are photocopies. At the top, I think there's a sender's front copy with "Page E."

A   Yes.

Q   And the address is St. John the

Page 49

Baptist Parish School Board, personnel department --

A   Uh-huh.

Q   -- P.O. Drawer --

    MR. KLIBERT:
        Yes?

BY MR. ROBY:

Q   -- Reserve, Louisiana, 70084?

A   Yes.

Q   And there's some handwriting on the document. I'm not sure where that comes from. It's, "Certified letter for Intent to Return in May. No response in January in regular mail."

A   Yes.

Q   Do you know who wrote that?

A   I wrote this. I'm not sure about the "Page E." That's not -- I don't believe that's my handwriting, but this is -- these are my notes.

Q   And to the best of your recollection, when did you write that?

A   I have no idea.

Q   Is there any particular reason why you referenced those notes on that document?

Douget Court & Video Reporters / Trial Technology Specialists
800-259-9900    After hours: 337-304-8207    Notices: robin@court-video.com

Page Eschette
October 23, 2018

Page 50

MR. KLIBERT:

Why she referenced it?

MR. ROBY:

She said she wrote it so I'm trying to figure out what does it represent.

A    I have -- I don't know that -- why I wrote them. I don't know.

BY MR. ROBY:

Q    Okay. The letter that you sent in May, you didn't send a different document regarding this January 23rd to be returned to school date, did you? For instance, you clearly have testified that you sent this document in May?

A    Right.

Q    And yet, even in May, the document could not have been returned by January 23rd of 2015 since you sent it in May. You didn't send another Intent to Return with a deadline for a May or June date here on the document, did you?

A    No.

Q    Okay. In the bottom portion of that second page, it shows a signature of

Page 51

someone, and the date of delivery as 5/20/15?

A    Yes.

Q    And the actual stamped dated by the postal service is May 20th of 2015?

A    Yes.

Q    Do you see that?

A    Yes.

Q    Okay. And it was to, I'm assuming, Joann Howard in Loyola D Unit 273, Kenner, 70065?

A    Yes.

Q    Okay. Did you maintain any other file for Ms. Howard which would have memorialized when you might have pinned your notes to that second page of that document?

A    (No response.)

Q    For instance, did you have an internal journal, or a calendar, or something which would --

A    No.

Q    -- more accurately reflect when you could have made those notes?

A    No.

Q    When did the school term end for the

Page 52

spring semester of 2015, if you remember?

A    The last week of May, you know, end of the third week of May, around that time.

Q    So it's fair to say that this document dated 5/20/15 would have been received by Ms. Howard prior to the school term ending?

A    Yes.

Q    And other than that document, do you have any other correspondence that you sent to Ms. Howard that referenced a request for her intent to return to work for the academic year of 2015-2016?

A    No.

Q    Now, at the time that you sent that document, Ms. Howard was still out on medical sabbatical leave, correct?

A    Yes.

Q    And you didn't send her any other documentation requesting an update on her medical status, did you?

A    No.

Q    And you hadn't received any other documentation from Dr. Cusco who had rendered an opinion in August of '14

Page 53

regarding her inability to return to work?

A    No.

Q    And you hadn't received any documentation from Dr. Arcuri regarding her ability to return to work, correct?

A    No.

Q    And did the staffing or lack of staffing in your opinion change at that time as opposed to what it may have been in December of '14? Let me ask it a better way. I think you testified that at some point prior to the January date of '15, you were concerned because you didn't have a position to fill because you had a teacher that was already out.

A    Right.

Q    We further established that at some point in December of '14, Ms. Howard had provided you with documentation from her treating physician, Dr. Arcuri, that she was still unable to return to work?

A    Right.

COURT REPORTER:

You have to speak up.

Douget Court & Video Reporters / Trial Technology Specialists
800-259-9900    After hours: 337-304-8207    Notices: robin@court-video.com

Page Eschette
October 23, 2018

Page 54

MR. KLIBERT:

You're not verbalizing.

A    Right.

BY MR. ROBY:

Q    And you considered those factors in addition to whatever else and her medical leave was extended for the spring of '15?

A    Yes.

Q    Okay. Did you likewise apply the same reasoning or consideration as you were preparing for the fall of '15?

A    Staffing in May is a consideration.

Q    So that would be a yes or a no?

A    Yes.

Q    Okay. You did. Now, it's important because I don't want you to guess.

A    No. It is. Staffing is a consideration. Yes.

Q    Your lawyer will tell you that he and I will be tasked to review your transcript.

A    Okay.

Q    And I would rather have an answer that's conclusive that I can follow, rather than trying to fill in the blanks to figure out what you meant to say.

Page 55

A    No. Staffing is a consideration.

Q    So staffing was a consideration at that time. Did you take any steps to verify your staffing concerns as it related to Ms. Howard, Ms. Howard's availability, other than sending that notice?

A    No.

Q    Okay. Did you have any conversations with her principal, I think at that time, Ms. Spears?

A    In regards to staffing, yes.

Q    As you sit here today, do you specifically remember if you discussed Ms. Howard's availability or not for the upcoming academic year?

MR. KLIBERT:

With whom?

MR. ROBY:

Ms. Spears.

A    Yes. Still having a conversation with her saying I don't know if she's returning or not.

BY MR. ROBY:

Q    Okay. So if Ms. Spears testified that she was not even aware of Ms. Howard's status

Page 56

at that time, specifically as the 2015-2016 academic year was approaching, that would not be an accurate reflection?

A    She would have been aware that she wasn't there, of course, and that she was on leave of some kind, and a discussion of whether she would be there the following year, of course, would have been discussed.

Q    So your testimony is she most certainly, not most certainly, but she would -- to the best of your recollection, the principal would have been aware of Ms. Howard's leave?

MR. KLIBERT:

That she should have been?

BY MR. ROBY:

Q    That she should have been aware of her leave?

A    She should have -- well, I mean if you're speaking of the type of leave, I don't know. She would have known that she wasn't there, and that she had been gone for a whole year.

Q    It makes sense to me.

Page 57

A    I don't necessarily -- I don't provide information, you know, unless questions are asked about specific reasons. Sometimes they're very clear, if the teacher's pregnant, you know, possibly a car accident, you know, death in the family. I don't divulge unnecessary information --

Q    Yes, ma'am.

A    -- about an employee to anybody unless it's absolutely necessary. So she knew that she was physically not there.

Q    Okay. That's 8?

A    8.

Q    I'm trying to get my numbers in my head.

MR. KLIBERT:

Yeah.

MR. ROBY:

8.

COURT REPORTER:

9 is next.

A    What is this? Don't forget this one.

MR. KLIBERT:

Those are together.

BY MR. ROBY:

15 (Pages 54 to 57)

Page Eschette
October 23, 2018

Page 58

Q   Those go together.  8a and b.  Were you ever made aware of Ms. Howard's request of Dr. Cusco to provide her with a plan of care?
A   No.
Q   Did anyone ever tell you that Ms. Howard requested copies of her medical file from Dr. Cusco?
A   No.
Q   To the best of your recollection, what was the plan of care that you believe Ms. Howard was requested to follow?
A   Clearance.
Q   And what does that mean?
A   Clearance from a doctor, you know, specifically what the original deposition [sic] said, you know, clearance based on a psychiatric eval.
Q   Dr. Cusco was not a psychiatrist, correct?
A   No.
Q   Dr. Arcuri was not a psychiatrist either, correct?
A   No.
Q   And your understanding is individuals that I believe were general practitioners,

Page 59

Dr. Cusco in particular --
A   Yes.
Q   -- would have required or would -- it would have been required of Ms. Howard to seek a clearance from a psychiatrist?
A   Yes.
Q   Did the school district identify who she was to see?
A   No.
Q   Now, the school district paid Dr. Cusco, correct?
A   Yes.
Q   And he was in fact an agent who had done work for the district before?
A   Yes.
Q   But the school district -- do you -- strike that.  Do you know if the school district had a relationship with a psychiatrist that Ms. Howard could have been referred to see for evaluation purposes before coming back to work?
A   I would have provided a name if the request was made.
Q   Is it your testimony that she was required to request the name of a psychiatrist from

Page 60

you before seeing someone for a follow-up eval?
A   No.
Q   Do you have any documentation that would support that that would have been a requirement for her to get that information from you?
       MR. KLIBERT:
          I'm going to object to the form.
       She just said it wasn't a requirement.
       I'm just making sure I'm following.
BY MR. ROBY:
Q   Is that what you said?  I don't know.  I'm not sure.  If that's what you said, then I missed that.  I'm not trying to trick you.
A   No.
       MR. KLIBERT:
          No, and it's not.  That's why I just want to be clear.
A   No, it's not a requirement.
BY MR. ROBY:
Q   Okay.  But you would have simply provided the name to her?
A   Yes.
Q   But your testimony is she never requested

Page 61

that from you?
A   Correct.
Q   Did you expect her to ask you for the name of a psychiatrist for a follow-up?
A   I didn't expect.  No.
Q   Okay.  And there's no documentation from you or anyone in the district that outlined what the procedure was for her to seek a second opinion from a psychiatrist, correct?
A   Correct.
       MR. KLIBERT:
          Object to from.  It's not a second opinion from a psychiatrist.
       MR. ROBY:
          Clearance.  Clearance.
       MR. KLIBERT:
          Fair enough.
       MR. ROBY:
          Okay.
BY MR. ROBY:
Q   There's no documentation --
       MR. ROBY:
          We work well together.
       MR. KLIBERT:

16 (Pages 58 to 61)

Page 62

Yes.
BY MR. ROBY:
Q  There's no documentation from you or anyone with the district that would have identified a psychiatrist for the purpose of Ms. Howard seeking clearance, correct?
A  Correct.
Q  Okay. And Dr. Cusco did not provide her with the name of someone that she should have -- she would have been referred to for such clearance, correct?
A  I don't know that.
Q  Well, we know that he only saw her once.
A  Okay.
Q  Correct?
A  I know my paperwork said once. Yes.
Q  And I haven't seen anything --
A  Right.
Q  -- to suggest otherwise.
A  Okay.
Q  And in the paperwork that we've all reviewed, there's no follow-up psychiatrist identified, correct?
A  Right. Correct.
Q  Okay. And at some point in the summer

Page 63

of 2015, in July, were you made aware of Ms. Howard's desire to return to work?
A  No.
Q  Your recollection is that at no point in time were you ever contacted by Ms. Howard that she intended to try to seek clearance to return to her previous position?
A  No, at no point in time.
Q  Ma'am?
A  At no point in time.
Q  Were you ever led to believe that Ms. Howard was resigning from her position as a teacher with the district?
A  At one point, there was a letter that was sent to the state department.
Q  That's the State Board of Education?
A  Yes.
Q  And that's a letter that Ms. Howard sent?
A  Yes, and a copy was sent to me.
Q  Who sent you the copy?
A  Actually, it came to me in an email. I may have gotten a hard copy from the same person, Ms. Heidi Trosclair.
Q  And who is Heidi Trosclair?
A  She -- at that time, she was a -- she's an

Page 64

employee, you know, an administrator. I don't know exactly what her title was at that very moment because it did change while in my -- during my tenor.
Q  With the Department of Education?
A  No. Actually, she is with St. John.
Q  Okay.
A  She was assistant director, I mean a director, administrative director.
Q  And that was from Ms. Trosclair, but the letter was to the Department of Education?
A  Uh-huh.
    MR. KLIBERT:
        Yes or no?
BY MR. ROBY:
Q  That's a yes?
    WITNESS:
        Huh?
    MR. KLIBERT:
        Yes or no?
A  Yes.
BY MR. ROBY:
Q  Okay. And you don't know how Ms. Trosclair got the letter?

Page 65

A  No, I don't.
Q  Okay. The letter that you're referencing, and I'll mark this for the purpose as --
    COURT REPORTER:
        It's 9.
BY MR. KLIBERT:
Q  -- 9, en globo. Take a look at those three pages of that document.
A  (Witness complies.) Yes. I think there was -- wasn't there more to it? I don't know. Maybe it's the way it's divided up here. Okay. Yeah. Here's the date right here. Yes, this is the letter.
Q  So that three-page document is an email and within it, I guess, the letter identifying Ms. Howard -- that document, do you remember the substance of the document?
A  Let me look back real quick. (Reading:) Upset about -- Ms. Howard was upset about the observation.
Q  The evaluation, the encompassed evaluation?
A  Actually, the evaluation encompasses two alterations. She was upset about the

17 (Pages 62 to 65)

Page Eschette
October 23, 2018

Page 66

second observation. The observation report. Yes.

Q And part of the reason why Ms. Howard had requested the medical leave was, I think it was first indicated in Dr. Arcuri's notes, that she was depressed and suffered from anxieties as it related to her job and evaluations that were performed on the job, correct?

A Yes.

Q And so the letter that you're referencing, she identified some of those specific concerns that she had concerning the evaluations, correct?

A Yes.

Q Okay. And did you, in your capacity as HR director, reach out or inquire from Ms. Howard what her intentions were as it related to her employability or desire to remain employed -- continued employment with the district?

A No, I did not.

Q Did you form any opinions as it related to after receiving that document from someone else in the district?

Page 67

A Upon reading the letter, I did take a look at the overall evaluation. I did look at her overall evaluation to see what her scores were. It was brought to my attention and I did look at her scores for the two observations.

Q Yes, ma'am.

A I felt like --

Q You felt like what now?

A The signature, teacher leaving profession, was disappointing. All right. Especially after I had seen the results of the evaluation, she was still classified as an effective teacher based on the evaluation.

Q And she sent that notice to the Louisiana Department of Education?

A Uh-huh.

MR. KLIBERT:

Yes or no?

BY MR. ROBY:

Q Yes?

MR. KLIBERT:

Yes or no?

A Yes.

BY MR. ROBY:

Page 68

Q She didn't send it to the St. John School District?

A No, she didn't.

Q She didn't send any other documentation to the district indicating her intent or desire to leave her position, correct?

A Correct.

Q And to the best of your recollection, she never provided any notice to the principal or the superintendent regarding her desire to leave her position with the district, correct?

A Correct.

Q Okay. I had asked you about Dr. Cusco and whether you were aware of Ms. Howard's request from him to provide medical -- copies of her medical records, and I think your response was you were never made aware of any request by her to Dr. Cusco for medical records. Is that your testimony?

A Correct.

Q No one from his office ever informed you that at some point in July of '15, Ms. Howard requested medical documentation

Page 69

from Dr. Cusco that were denied?

A No, I was not aware.

Q No one from his office told you that they informed her that they work for the district, and therefore could not provide her with any medical documentation?

A No, I did not know that.

Q And the reason for that was because the district hired Dr. Cusco, and the district was paying his bill and not Ms. Howard?

MR. KLIBERT:

Your question is, was she aware that someone from Cusco's office made that comment?

MR. ROBY:

Correct.

A No, I'm not aware.

WITNESS:

Thank you. That was a loaded question.

BY MR. ROBY:

Q And further, were you ever made aware of a request from Ms. Howard to Dr. Cusco regarding a specific treatment plan that she was required to follow?

18 (Pages 66 to 69)

Page Eschette
October 23, 2018

Page 70

A   No, I'm not aware.

Q   And again, we may have covered this, but I want to make sure that I'm clear. To the best of your recollection, did Dr. Cusco provide you with a copy of a particular treatment plan that he recommended for Ms. Howard?

A   No.

Q   Okay. Was there any other treating or referring physician for Ms. Howard that you or anyone else employed by the district requested to be put in place as a condition of her sabbatical leave, other than her initial treatment and only treatment by Dr. Cusco?

A   Okay. Can you repeat that for me?

Q   Sure. To the best of your recollection, do you know if there was any other recommendation made by any other medical provider regarding a treatment plan for Ms. Howard, other than her initial visit with Dr. Cusco?

A   No, I'm not aware of any other --

Q   And --

A   -- plan. I'm not aware of any other plan.

Page 71

Q   Okay. And when we say plan, the plan that he referenced in that 8/12/14 note was for her to seek psychiatric care or clearance before returning to work?

A   Correct.

Q   And that is the extent of the plan that the district put in place?

A   Correct.

Q   And so is it a matter of semantics when we use the term plan as opposed to a clearance letter?

A   I would think it's a matter -- it's clearance. I think of it as clearance, and it is a matter of semantics. Yes. Plan, clearance.

Q   Because the plan would suggest some action to be taken, correct?

A   Yes.

Q   Protocol, some course of action, something to follow?

A   Correct.

Q   As opposed to examination where a determination can be made of a person's particular status?

A   Correct.

Page 72

Q   And a better example, I guess, would be a course of treatment. You're to come in and do A on Monday, B on Tuesday, C on Wednesday, D on Thursday, and then follow that course for the next three weeks. Come back and see me a month later.

A   Correct.

Q   For follow-up.

A   Correct.

Q   Dr. Cusco, using that example, didn't authorize or suggest anything other than psychiatric's clearance from Ms. Howard?

A   Correct.

Q   Okay. Who is Patricia Triche? Is it Triche or Triche?

MR. KLIBERT:
Triche.

A   Triche.

BY MR. ROBY:

Q   Triche.

A   At that time, she was the preschool administrator.

Q   And you used one of those legal terms of art at that time. So I'm assuming during the relevant period of the 2014 to 2015-16

Page 73

academic year?

A   Right.

Q   Okay. I'm going to show you what I've marked for purposes of identification as Howard 10, and tell me if -- and ignore the exhibit number at the bottom. It's a previous reference.

A   (Witness reviews document.) Yes, I recognize it.

Q   And what is this?

A   This was an email that was sent by Ms. Triche requesting clarification of whether Ms. Howard was planning on returning to work.

Q   There's a note at the top that says, "Sent by principal." Do you know who pinned that?

A   I did.

Q   And what was sent by principal?

A   This email.

Q   And Ms. Triche worked for Principal Spears?

A   No. She was actually the administrator or the director over preschool, preschool classes, in the district.

19 (Pages 70 to 73)

Page Eschette
October 23, 2018

Page 74

Q   So when you say it was sent by the principal, that would have been Ms. Spears?
A   Because Ms. Triche served as the principal. She as an administrator, a director in the district, director over preschool, head-start administrator, but she served in the capacity of the principal over those classrooms.
Q   Okay. So when you say "sent by principal," you're not referencing Ms. Spears --
A   No.
Q   -- who was her principal?
A   No.
Q   Because that was kind of confusing to me.
A   Preschool classes are throughout the district at different schools. Okay. So each school has a site principal at that time. I don't know if they're doing it like that now.
Q   Yes, ma'am.
A   Okay. But each school has a site principal, and the site principal would be Ms. Spears. All right. But once you move

Page 75

into the preschool arena, for lack of another word, and you're teaching a preschool class, whether it's head-start, LA4, all of these are different types of universal pre-K, then you also have Ms. Triche as an administrator, as well, and she's visiting the schools, and she's actually -- so she serves as -- if I have a problem with preschool, she serves as that principal.
Q   Do you know if Ms. Triche had worked with Ms. Howard prior to this August 6th of 2015 email?
A   I don't know that.
Q   Okay. I think at the time of her, Ms. Howard's, original request for leave, she was actually working at Fifth Ward Elementary?
A   Uh-huh. Correct.
Q   And the site principal was Ms. Spears?
A   That's correct.
Q   And so there's no documentation in no email that you might be aware of from Ms. Spears to Ms. Howard as to her teaching position for the academic year of

Page 76

2015-2016, correct?
A   Say that again, please.
Q   Are you aware of any email that may have been sent by Ms. Spears as the site principal --
A   No.
Q   -- regarding Ms. Howard's availability or desire to return to her position for 2015-2016?
A   No, I'm not.
Q   Okay. Do you know if Ms. Howard actually received this email?
A   I do not know.
Q   Have you been told that she has testified that she never received any notice or an email from the district?
A   I have not been told. No.
Q   And other than this email, are you aware of any correspondence, certified mail, regular mail, that was forwarded to Ms. Howard contemporaneous to this August 6th date of '15 regarding Ms. Howard's no-show or unavailability for the academic -- for the coming year of 2015-2016?
A   No, I'm not aware.

Page 77

Q   That first sentence, "I would like some clarification of your status with the position at the Child Development Center." Do you know if Ms. Triche was made aware of Ms. Howard's previous approval for sabbatical medical leave?
A   I don't know that she was made aware of that. Again, I don't divulge information that I don't have to.
Q   Well, you were copied on this email, correct?
A   Yes.
Q   But you were aware of her previous approval because you had in fact approved it?
A   Right.
Q   Did you follow up with Ms. Triche to inform her that within the parameters of what you could disclose that Ms. Howard was previously on an approved medical sabbatical leave?
A   I don't know that I gave her that information. I do know that she knew that she was out the previous year probably, but that -- I was waiting for her to

20 (Pages 74 to 77)

Page Eschette
October 23, 2018

Page 78

return.

Q   As you sit here today, do you think that that's something that you probably should have told Ms. Triche?

A   About a medical sabbatical?

Q   That you had previously approved Ms. Howard for an extended medical sabbatical leave.

A   No.  I don't feel like I should have had to tell her.

Q   And she had been out for more than a year, correct?

A   That's correct.

Q   And you had no other follow-up with Ms. Howard to verify her status during this time, correct?

A   No, I had not.  I didn't.

Q   You were aware that she -- you had already approved her to be out for the spring of '15?

A   Uh-huh.

Q   Yes?

MR. KLIBERT:

Yes?

A   Yes.

Page 79

BY MR. ROBY:

Q   Okay.  And you likewise testified that you sent out a notice in May -- May 20th is the receipt date on the card, correct?

A   Correct.

Q   And you testified that someone in the district had been provided with a copy of a letter that she had previously sent to the Louisiana Department of Education in June of '15?

A   Correct.

Q   And you had not received any follow-up documentation regarding her medical status from either Dr. Arcuri or Dr. Cusco, correct?

A   Correct.

Q   And you further testified that you were never told about Ms. Howard's request of medical information from Dr. Cusco in at least July of '15?

A   Correct.

Q   And yet when you get an email from Ms. Triche in August of '15 regarding Ms. Howard as a no-show, you didn't think it necessary to mention to Ms. Triche

Page 80

about Ms. Howard's previous medical status that you had approved?

A   I don't know that I didn't -- I told her she was on leave.  I don't know that I said it was a medical sabbatical, but that she was not -- that she hadn't done a letter of intent.  I'm sure I told her that.  We didn't know if she was returning.

Q   Did you tell her she was on leave -- okay.  Did you tell her that she was on leave after she copied you on this email?

A   I don't know when that conversation took place.

Q   What grade did Ms. Howard teach, do you remember?

A   Initially, I believe it was first grade.  All right.  She left.  That was last year she -- I think it was first grade.

Q   Were you aware that she was being requested to teach a fifth grade position?

A   Yes.  Ms. Spears had moved her to fifth grade.

Q   So why would it be necessary for someone who was focused on pre-K to send her a

Page 81

notification when she was being assigned to a fifth grade position?  Fifth grade is clearly no pre-K.

A   Fifth grade was the position for the 2014-15 school year, the year that she was on leave.  This was the upcoming school year for 15-16.

Q   So how would she had known that she was going to be going back to either first grade or pre-K if no one had any communication with her?

A   She wouldn't have known until we made -- had communication, and we had a lack of communication.

Q   Well, we know we have an email that was allegedly sent to her.

A   Uh-huh.

Q   Correct?

A   Correct.

Q   And we know that was a bulk mail that was sent out in January of '15 to her and everybody else in the district?

A   That's correct.

Q   And we know that there was a certified form regarding her desire to return to

Douget Court & Video Reporters / Trial Technology Specialists
800-259-9900    After hours: 337-304-8207    Notices: robin@court-video.com

Page Eschette
October 23, 2018

Page 82

work with a return date for January of '15, but yet, the request was to, I guess, fill out as soon as you get it, right?

A   Of course.

Q   And there's no accompanying correspondence with that document that we had previously identified, the two pages, that would have evidenced any other request for activity or conduct by Ms. Howard, other than to complete the intake form?

A   Right.

Q   It didn't give any indication of any type of classroom assignments in that correspondence, correct?

A   Correct.

Q   And to the best of your recollection, as you sit here today, there was no other notice or information that would have been sent to Ms. Howard that would have identified what position she would have been required to fill for the proposed 2015-2016 academic year, correct?

A   I don't know that anything had been sent by -- that assignment is not my office. That type of assignment is not my office.

Page 83

Q   I get it. And I guess the concern is, you know, when we first started, you wore a lot of hats.

A   Yes.

Q   You know, a lot of duties and responsibilities.

A   Okay.

Q   I get it. So I don't want to assume anything. And so when you were listing all of those duties and responsibilities that you had, I didn't know if that was one of those things.

A   No.

Q   If that was one of those things that you were required to do, as well.

A   No. That is not a requirement.

Q   Okay. I'm going to show you what I've marked for purposes of identification as Howard 11. So that I'm clear, it is not part -- it's your testimony that it was not part of your duty and responsibility to announce assignments?

A   No, it's not.

Q   Okay. I'm going to show you what I've marked as 11. I haven't marked it yet, so

Page 84

I'm good.

A   Can I clarify grade assignments?

MR. KLIBERT:

Yes. You can clarify anything.

A   Grade assignments, yes.

BY MR. ROBY:

Q   So you do assign positions at schools, but not grades?

A   Correct. Administrators make grade changes.

Q   Okay. I'm going to show you what I'll still mark for the purposes as Howard 11.

MR. ROBY:

That's right, huh?

COURT REPORTER:

Yes.

BY MR. ROBY:

Q   And this is the letter dated May 1st of '14. Tell me if you recognize that.

A   (Witness reviews document.) Okay.

Q   Yes?

A   Yes.

Q   And the date on that letter is May --

A   First.

Q   -- May 1st of 2014, and that's the spring

Page 85

that Ms. Howard actually went out after that period on leave, correct?

A   Correct.

Q   And in the first paragraph, what does it say?

A   "It's my pleasure to announce your assignment as a member of the staff of fifth grade elementary school of the 2014-2015 school year."

Q   Do you remember sending out a letter like that for the -- announcing an assignment for the 2015-16 school year?

A   I do not remember that.

Q   And the next paragraph says, "Please contact your principal for details of your responsibilities and the dates of any meetings prior to the opening of the school for the coming year"?

A   Correct.

Q   "Thank you for your service to St. John school this year. Have a wonderful relaxing summer"?

A   Yes.

Q   Signed by you?

A   Yes.

22 (Pages 82 to 85)

Douget Court & Video Reporters / Trial Technology Specialists
800-259-9900    After hours: 337-304-8207    Notices: robin@court-video.com

Page Eschette
October 23, 2018

Page 86

Q  Director of Human Resources?

A  Correct.

Q  Okay. And I'll show you what I've marked for purposes of identification as Howard 12, and this letter is dated August 17 of '15. Tell me if you recognize it. Tell me if you recognize that document.

A  (Witness reviews document.) Yes, I do.

Q  And what is that?

A  A letter to Ms. Howard, dated August 17, 2015, in reference to her not returning to her job at St. John Parish.

Q  And the first paragraph reads what?

A  "It's come to our attention that you have not returned to your job with St. John the Baptist Parish for the 2015-16 school year."

Q  And what did you mean when you say "it's come to our attention"? What does that mean?

A  Our attention, the personnel department.

Q  And --

A  And the district, the administration.

Q  And how did you come to the conclusion that she had not returned to the job for

Page 87

the 2015-2016 school year?

A  Several ways. Talking to the principal, attendance records, time clock. I can't tell you which one I -- of course, talking to the principal.

Q  What about talking to her?

A  No.

Q  No one ever decided to reach out to her regarding her intentions to return to work?

A  I did. I sent the letter out in May.

Q  And that's the letter that we referenced?

A  Yes.

Q  And when you say "letter," there's nothing in that document -- and I'm not sure what number it is. It's a two-page document.

A  Letter of Intent?

Q  Yes. It's a form, right?

A  Uh-huh.

Q  So you sent the form out for her to fill out --

A  Uh-huh.

Q  -- and it was not returned filled out by her?

A  Correct.

Page 88

Q  And this is the same employee of the district who had been out for the previous academic year on medical sabbatical leave, correct?

A  Correct.

Q  And so is it your testimony the extent of your contact regarding her status was sending the form out for her to be completed?

A  And the expectation of her contacting the district to let us know if her intent to return based on the policy. When you're going to go on a sabbatical, there is an expectation, and I think that was in a previous letter, an expectation of notifying the district of the intent to return.

Q  And is it your testimony that that's -- you were satisfied that you had done your job by sending out that notice, and she had not done hers by not informing the district of her specific intent to return, or by completing that form?

A  Correct.

Q  Okay. The second paragraph of that letter

Page 89

reads what?

A  It reads, "According to St. John the Baptist School Board policies, employees may be terminated after ten days of absence when there is no communication from the employee. Please be advised that your employment with St. John school," it should have had district there, "has been terminated effective today, August 18th, 2015."

Q  And what is the ten-day period that you're referencing?

A  The first day a teacher is to report to school.

Q  And to the best of your recollection, what date was that?

A  Must have been August 6th, August 7th, around in there. Well, the weekend's in there, so it would have to be ten working days.

Q  Well, we know that we have that email, right, that Ms. Triche is alleged to have sent to Ms. Howard. That's dated August 6th, correct? It's Howard 10.

COURT REPORTER:

23 (Pages 86 to 89)

Page Eschette
October 23, 2018

Page 90

This one?

MR. ROBY:

Yes, ma'am.

A   That's correct.

BY MR. ROBY:

Q   August 6th of 2015, at 7:55 a.m.

MR. KLIBERT:

Let me see it because I think y'all are talking about two different things.

A   Yeah. I don't know that that was the first day. I mean, there's professional development days that are part of the school calendars, so I really can't tell you what the first day of that school term was.

BY MR. ROBY:

Q   Well, we know that she was terminated effective August 18 of '15.

A   Okay.

Q   And so depending on how you count the ten days, that was either August 8th, or some time shortly before August 8th?

A   Correct.

Q   Okay. And the letter is actually dated

Page 91

August 17th.

A   Okay.

Q   Right?

A   Correct.

Q   So this letter was sent certified mail and regular mail?

A   Correct.

Q   Do you have the corresponding green cards to show if Ms. Howard actually received the letter of termination?

A   I --

Q   We have the ones that concern the May 20th date, but do you have your return cards to show that she actually got this letter of termination?

A   If it wasn't with the file, no, I don't.

Q   Do you know if you discussed her termination with the superintendent?

A   In the respect that we had a discussion of whether it should happen or not. If it's job abandonment, you know, it was pretty cut and dry, you know, as far as a discussion, but I'm sure I let him know this teacher did not show up for the first day of school.

Page 92

Q   Cut and dry for who, Ms. Eschette, cut and dry for you, or cut and dry for the persons being fired? What do you mean when you say it's cut and dry?

A   Well, we usually have two or three people that don't show up for work the first day of school. All right. It usually means that they have a job in another district. All right.

Q   Did you verify that?

A   No, I did not.

Q   So I don't want you to assume anything.

A   All right.

Q   So when you phrase it like that, I don't want to --

MR. KLIBERT:

She's answering the question.

MR. ROBY:

I get it. She gave me an assumption.

BY MR. ROBY:

Q   Did you understand my question?

A   Okay. What I mean, cut and dry, you know, they're physically not there, so they're not on the job. So it's considered job

Page 93

abandonment.

Q   Okay. And so the fact that she's not there, you just assumed that she was not there by choice?

A   Correct.

Q   And not that there may have been extenuating circumstances, for instance, securing some medical documentation to return to work, correct?

A   Correct.

Q   Or the fact that she still may have been medically unable to return to work?

A   Correct.

Q   And you didn't verify that in correspondence from her prior to reaching this determination on August 17th that she had abandoned her job, did you?

A   I did not verify it, nor did she make contact with me.

Q   Okay. And you didn't verify -- did you conduct any type of an investigation?

A   Investigation as far as --

Q   Why she wasn't at work.

A   -- my paper -- no.

Q   I'm going to ask you the same question I

24 (Pages 90 to 93)

Page Eschette
October 23, 2018

Page 94

asked the superintendent. Do you think it important enough to investigate an employee's status before you reach a conclusion to terminate them, that they had actually abandoned the position?

A    Not if I have a paper trail showing that she received notice.

Q    And the paper trail that you're referring to is the correspondence that was sent on the 20th -- that was signed on the 20th of May, correct?

A    And the policy that states that she needs to make contact thirty days prior to the next semester.

Q    And a thirty-day notice that you're -- so now we're into the thirty-day notice. So what would have been the thirty-day deadline to receive notification by the district before you reached this decision?

A    I would have accepted her coming back up to the very first day when school started, even if she had appeared prior -- you know, even if she had missed the PD. At a certain point, you know, we take all factors into consideration. If she'd

Page 95

showed up on August 10th, which was definitely after the beginning of the school year, with doctor clarification or clearance, all of that, you know, we would have -- chances are, based on that documentation, she would have returned to the classroom.

Q    And this would have been documentation from any qualified psychiatrist?

A    Based on what that psychiatrist documented.

Q    Anyone she could have chosen?

A    Yes.

Q    Were you aware of an EEO complaint that Ms. Howard had filed against the district?

A    Yes, I was.

Q    And when were you made aware of that EEO complaint?

A    Gosh, I don't know off the top -- the date off the top of my head.

Q    You prepared a response to the EEO complaint that she had filed on behalf of the district?

A    Correct.

Q    I want to show you a letter that's dated

Page 96

April 24th of '15, and I'm going to mark this as Howard 13 en globo.

A    (Witness reviews document.)  Yes.

Q    And you're the author of that document, correct?

A    Correct.

Q    And you prepared the attachments in response to the charge --

A    Correct.

Q    -- filed by Ms. Howard?  And Ms. Howard, if I told you that she had contacted EEO at some time in March of '15, which is a month prior to your response, you wouldn't disagree with that, would you?

A    No, I would not.

Q    And if I told you that the documentation regarding her charge of discrimination concerning race, retaliation, and disability, according to the documentation provided by the EEOC, you wouldn't disagree with that information either, would you?

A    No, I would not.

Q    And did EEOC in fact tell you specifically what Ms. Howard had alleged that allows

Page 97

you to form the basis of your response?

A    Yes, they did.

Q    So prior to you sending out your notice letter, status letter, status letter to Ms. Howard regarding her intent to return to work, you were aware of an EEO charge that she had filed against the district?

A    Yes.

Q    Matter of fact, a little bit more than a month before you sent out that document, that one-page intent, you had already provided the EEOC with your submission?

A    Yes.

Q    And in your submission, you identified your position as human resources director?

A    Yes.

Q    You also provided the EEOC with what appeared to be a, I don't want to say spreadsheet, a matrix maybe.

A    Okay.

Q    For lack of a better description.

A    Yes.

Q    And that was at least a two-page document identifying employees, not by name, but by number, race and sex, and particularly

25 (Pages 94 to 97)

Page Eschette
October 23, 2018

Page 98

their request for extended sick leave or sabbatical leave since July of '13?

A    Correct.

Q    And there is an additional column indicating request for second opinions by the employees?

A    Correct.

Q    And the reasons for requests identified various categories ranging from general medical concerns to specific concerns, more particularly cancer, heart attacks, even including pregnancies?

A    Correct.

Q    And some categories for stress as it relates to death or illness of family members, stroke, as well as considerations for surgeries?

A    Correct.

Q    Arthritis?

A    Correct.

Q    Depression?

A    Correct.

Q    Podiatry issues?

A    Correct.

Q    Migraines, paranoia, psychosis, those

Page 99

types of things?

A    Correct.

Q    All the way down. And it further, even on page 2, identifies the employees, not by name, but by number, and their race and their sex?

A    Correct.

Q    And this information is information that you prepared?

A    Correct.

Q    Did anyone assist you in this compilation?

A    We -- yes, my assistant.

Q    And that would be who at the time?

A    Okay. I got to get my years straight. When I got a change -- I had a change in -- that would be Ms. Duhe.

Q    Okay.

A    Because I did have a change later on in assistants.

Q    So Ms. Duhe, to the best of your recollection, would have been the person to assist you in accumulating the data that you prepared and sent to the EEOC?

A    Correct.

Q    You didn't send them any files with

Page 100

redacted information such that they would be able to verify the race or sex or reasons for leave that you identified in your document dated April 24th of '15, correct?

A    Correct.

Q    And likewise, I think you also provided them with a copy of the letter that Ms. Howard sent to the superintendent dated August 21st of '14 where she was requesting approval for leave?

A    Correct.

Q    Okay. The letter that you referenced, August 21st of '14, was that a letter sent to you, or was that sent to the superintendent?

A    I need to see the letter.

Q    Give me one second, Ms. Eschette, so I can put my hands on it. I know it's in one of our exhibits.

MR. ROBY:

I have my copy, but it's in the -- off the record for a second.

(OFF THE RECORD)

BY MR. ROBY:

Page 101

Q    I'm going to show you, ma'am, which is a four-page document identified as Howard 14 dated August 21st, 2014. Please ignore the previous exhibit sticker at the top. Again, we've attached these and used them on multiple occasions, so that number bears no significance.

A    (Witness reviews document.)

COURT REPORTER:

I think she's waiting for you.

BY MR. ROBY:

Q    Oh, I'm sorry. You're ready?

A    Oh, yeah. I mean, I thought the question was --

Q    I'm sorry.

A    -- was this the letter --

Q    I thought you were reading. I thought you were reading.

A    No. I thought you had asked me was this letter to Mr. George or to myself that was sent.

Q    No. That was -- you referenced a copy of a letter in number 3.

A    Yes, I did.

Q    Okay. Is that the letter you were

26 (Pages 98 to 101)

Page Eschette
October 23, 2018

Page 102

referencing dated August 21st of '14?

A  Yes. The letter to Mr. George.

Q  And that letter was sent to Mr. George and not to you?

A  Correct.

Q  Do you know who provided you with a copy of that letter?

A  Mr. George's office.

Q  Not Mr. George particularly?

A  You know, I don't know.

Q  Do you know if you had any discussions with the superintendent contemporaneous to the August 21st, '14 date?

A  I don't remember.

Q  Do you remember if you had any conversations with Mr. George contemporaneous to your April 24th, '15 date when you were preparing the submission to the EEOC?

A  Yes, I did have communication with him in reference to the August -- what was the date that I sent the EEOC?

Q  April 24th of '15.

A  Right. I did have conversations with him.

Q  And so, to the best of your recollection,

Page 103

what did you discuss with him concerning your preparation or the response?

A  The conversation would have been -- you know, he gave -- of course, he received the complaint. It came to me. His office would have provided me with a response, I mean the complaint. The expectation was for me to reply. Conversation would have been to respond and provide him with a copy, of course, and to make contact. If I'm not mistaken, it would have been on Mr. O.J. Jasmine to preview it before.

MR. KLIBERT:
Don't talk about what you did with any of the other school board lawyers.

WITNESS:
Oh, okay.

MR. ROBY:
I don't know who O.J. is.

MR. KLIBERT:
That's why I said that. And to be more specific, don't tell him about conversations with Jasmine. The fact that you talked to him, that's fine.

WITNESS:

Page 104

Okay.

A  So just in conversation, of course, for me to reply.

BY MR. ROBY:

Q  Do you know if -- strike that. Did Mr. George, to the best of your recollection, ever respond to this April 21st, '14 letter of concerns submitted by Ms. Howard?

A  I do not know that.

Q  Okay. You don't remember if -- did he ever ask you to respond to any of her concerns contemporaneous to the August 21st, '14 date?

A  No, he did not.

Q  What about after your April 24th, '15 submission date, were you ever asked to respond to any of the concerns or allegations that -- directly to Ms. Howard?

A  No, I was not.

MR. ROBY:
What number are we on?

A  It's 14.

COURT REPORTER:

Page 105

The last one's 14.

MR. KLIBERT:
14.

MR. ROBY:
Okay.

BY MR. ROBY:

Q  Prior to you making the decision to fire Ms. Howard, did you talk to her principal about your decision to terminate her?

A  I'm sure I did. I'm sure I let them know that it would be job abandonment.

Q  You're sure because that's what you typically would have done, or you --

A  That's what I typically would have done.

Q  Okay. So you don't have any independent recollection other than your usual course of action?

A  Correct.

Q  I'm going to show you what I'll mark as Howard 15, and tell me if you recognize this document.

MR. ROBY:
It was in a batch of discovery you just gave me, Kevin.

A  (Witness reviews document.) Yes, I

27 (Pages 102 to 105)

Page Eschette
October 23, 2018

Page 106

recognize it.

BY MR. ROBY:

Q And what is that?

A This is an online payroll status form that we started using that school year.

Q Okay. And that's -- would you consider that as an official document prepared by the district?

A Yes.

Q And in looking at this document, it identifies the name for, I'm assuming, the person of interest as Joann Howard?

A Correct.

Q And the date, the status change date?

A Correct. 8/19/2015.

Q 8/19/2015?

A Correct.

Q And what is the purpose of this document?

A Again, it goes to payroll, technology, departments. It alerts them to not pay this person anymore.

Q And on this document, this alert, what's in the comment? What does the comment say?

A "Resigned August 19th, 2015."

Page 107

Q And it doesn't say terminated, correct?

A No, it does not.

Q Do you know who would have prepared or submitted this information?

A This would have been -- at this time, I think it would have been a new assistant.

Q A new assistant. Do you know who that new assistant might have been?

A Nicole Brown.

Q Nicole Brown?

A Yes.

Q And someone would have had to inform Ms. Brown of Ms. Howard's status, or change in status?

A Correct.

Q And who might have informed Ms. Brown of the change in status?

A Myself.

Q And do you remember informing Ms. Brown of Ms. Howard's status as resigned, as opposed to being terminated?

A She was aware of this -- these letters because she typed many of these letters for me. So she was aware of it as being terminated. This could have been a

Page 108

clerical mistake.

Q We know what it could have been, but the document clearly shows --

A She would have known terminated.

Q Okay. That document says resigned?

A Yes, you're right. It does.

Q So that's what we do know?

A Correct.

Q As opposed to what it could have been?

A Correct.

Q All right. And again, the date is 8/19?

A Yes.

Q Of 2015?

A Yes.

Q Do you have any other documentation subsequent to the 8/19/2015 date that references Ms. Howard's status?

MR. KLIBERT:

Besides what you've already provided?

BY MR. ROBY:

Q Other than what we've already reviewed?

A No.

Q Okay.

MR. ROBY:

Page 109

Can we go off the record?

MR. KLIBERT:

Sure.

(OFF THE RECORD)

MR. ROBY:

Ms. Eschette, I don't think I have anything else that we haven't already covered. I appreciate your patience.

COURT REPORTER:

Kevin, you don't have anything?

MR. KLIBERT:

No.

COURT REPORTER:

Did you need a copy, Kevin?

MR. KLIBERT:

Yes.

(DEPOSITION CONCLUDED AT 1:06 P.M.)

28 (Pages 106 to 109)